# IN THE COURT OF APPEALS OF IOWA

No. 14-0586
Filed April 22, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MATTHEW JAMES GRADY JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.


        Matthew Grady Jr. appeals his judgment and sentence for first-degree murder.  **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, and Stephan J. Japuntich, Assistant Appellate Defender, for appellant.

        Matthew James Grady Jr., Fort Madison, pro se appellant.

        Thomas J. Miller, Attorney General, Kyle P. Hanson and Aaron J. Rogers, Assistant Attorneys General, John P. Sarcone, County Attorney, and Susan C. Cox and Justin G. Allen, Assistant County Attorneys, for appellee.


        Heard by Tabor, P.J., and Bower and McDonald, JJ.

**BOWER, J.**

In 2010 a jury found Matthew Grady guilty of the August 2009 murder of Stephen Scott. This court reversed his conviction on appeal.[1] Upon retrial in March 2014, a jury once again found Grady guilty of the first-degree murder of Scott, and the court sentenced him to life imprisonment. Grady appeals, raising three evidentiary issues: (1) the district court abused its discretion in admitting the officer's testimony Grady had been "overall deceptive" during his police interrogation; (2) Grady's admission during the interrogation, without context, to firing a gun thirty days before the homicide constituted inadmissible "bad acts" evidence; and (3) the trial court abused its discretion in admitting a parole officer's opinion as to a parolee/defense witness's character for truthfulness. In a pro se brief, Grady raises issues regarding the search warrant that was issued, partially, on the basis of information from named, citizen informants. We affirm Grady's conviction.

## I. Background Facts and Proceedings

On the evening of Sunday, August 16 and continuing into August 17, 2009, thirty-five-year-old Demarkus Simon attended a party at Vera Scroggins' house located south of Drake Park Avenue in the 1000 block of 22nd Street, Des Moines. Simon observed a young African-American man wearing a striped-pattern, multi-colored shirt arrive at the party around ten to eleven p.m. with two other people. Simon did not know the name of the young man in the striped shirt

---

[1] *See State v. Grady*, No. 10-1532, 2012 WL 1611964, at *5 (Iowa Ct. App. May 9, 2012) (ruling after Grady invoked his right to silence, his subsequent answers in the police interview should have been suppressed at trial).

at that time; at trial, Simon knew him to be twenty-year-old Matt Grady. Simon testified he could not recall exactly what time Grady left the party, but Grady did leave and was gone for more than a few seconds, for "hours."

The video from surveillance cameras shows Stephen Scott arrived at the nearby Kum & Go on University/22nd Street[2] in Des Moines around 4:00 a.m. on August 17, 2009. Scott entered the store, bought a Red Bull, and received forty dollars cash back. During this time, the video shows a passenger wearing a yellow-striped "bumblebee" shirt remained in the front seat of Scott's car. At 4:03 a.m., Scott returned to his car and drove away, heading west. At 4:04 a.m., the taillights of Scott's car disappear from the video. Eventually, Grady admitted to the police that he was the passenger shown in the video.

Also in the early morning of August 17, Jorge Archila Lopez was awakened by the sound of multiple gunshots. He lived in a second-floor apartment in the 1000 block of 22nd Street, Des Moines. Archila Lopez looked out his bedroom window towards 23rd Street and saw a car close to a door on the north side of a church.[3] Archila Lopez explained the church had lighting in that area, and he believed the car was white. Archila Lopez testified he saw a black male with "curly, curly" black hair standing "close to the car" on the driver's side—"I guess you can say to the back door right by the car." This man was wearing a white tank top, and Archila Lopez observed something, possibly another shirt, slung over his shoulder. When the car started to move slowly

---

[2] University Avenue is the first street running east and west directly north of Drake Park Avenue, also an east/west street.

[3] Detective Michael McTaggart testified the distance from the Archila Lopez apartment to the church was 75-100 feet.

down the narrow, one-lane church driveway towards 23rd Street, the black male outside the car ran away across the yard to the north. Archila Lopez only saw the side of the man's face and lost sight of the car as it neared 23rd Street. Archila Lopez told the police the man was anywhere between 5'5" and 6' tall and weighed between 180 to 200 pounds. At trial, the prosecutor showed a picture of Grady, State's Exhibit 68, to Archila Lopez, who testified the black male he saw had hair like the hair on the person in the picture. In that photograph Grady's hair is sticking out in numerous tight curls or short dreadlocks.

Also in the early morning of August 17, 2009, Christopher Riggs arrived home after working the night shift. Riggs heard four gunshots and also heard a car hit a tree. Riggs went outside, yelled at his brother to dial 911, ran about 100 yards to Scott's car, and found Scott slouched inside, gasping for air. Riggs attempted to comfort Scott. At 4:17 a.m., thirteen minutes after the convenience store's video shows Scott and Grady leaving the convenience store together, the police received a 911 call reporting a car accident in the 1000 block of 23rd Street.[4] Riggs testified Scott died within thirty to thirty-five seconds and before the police arrived. When Scott died only Riggs, Riggs's brother, and another neighbor were near the car.

Simon testified Grady was not at the Scroggins house when Simon heard what he thought were firecrackers but what could have been gunshots. Simon testified Grady returned to the house about twenty minutes after the loud noises.

---

[4] Allison Ness, a senior public safety dispatcher for Des Moines, testified she received the 4:17 a.m. call about Scott's car hitting a tree, the police were dispatched at 4:18 a.m., and the officer arrived at 4:20 a.m. Officers remained at the scene until 12:30 in the afternoon of August 17.

Grady was still wearing the "bumblebee" shirt. After the loud noises, Simon heard police sirens and knew the police were present. Simon testified:

> Q. When [Grady] returned to [the] house, did he make statements about why the sirens and the police were present? A. That there was an accident that occurred a couple blocks away.
> Q. What did [Grady] say about the accident? A. That there was a car that ran into a tree.

Simon observed Grady, upon his return, was acting differently than before. Earlier, Grady had not been nervous. But after the loud noises and Grady's return, Simon observed Grady was nervous, his "eyes were shifting back and forth." Simon and others "sat on the porch, curious as to what happened." Simon suggested they go see what had happened, but Grady "didn't want to go." Grady went around the side of the house for a few seconds to go to the bathroom. When Grady returned, he was bare-chested, having removed his "bumblebee" shirt and placed it over his shoulder. Grady was still at the house when Simon left.[5]

At the accident scene, officials noted both the driver's window and front passenger window of Scott's car had been cranked completely down. The officials observed the zipper on Scott's jeans was down and his underwear was pulled down. Inside Scott's pockets they found a cell phone, a time-stamped receipt from the nearby University/22nd Kum & Go, and one $20 bill. When the officials moved Scott's body, they discovered a gunshot wound and summoned

---

[5] Simon left in a cab he called from the house phone. Simon, by being out in the early morning, was out of compliance with his supervision for a 1998 offense. Therefore, Simon gave his uncle's name to the cab company.

homicide detectives Michael McTaggart and Daniel Blom. McTaggart became the lead detective of the investigation.

When McTaggart and Blom arrived, they observed the rear driver's-side window of Scott's car had been shattered and a trail of broken glass going south on 23rd Street. The trail of broken glass continued into the narrow driveway on the north side of a church. More broken glass was found in the northern part of the parking lot behind the church.[6] During his search of the area, Blom found two spent shell casings that had ejected out of a semi-automatic gun. Eventually, a total of four spent shell casings were found in the church area. Believing this evidence looked "fresh," McTaggart called for the crime scene unit. The unit arrived and secured the area.[7]

Based on the receipt in Scott's pocket, McTaggart went to the Kum & Go and viewed the store's video. His main focus became the person in the front passenger seat of Scott's car "because the original 911 call comes in just a couple minutes after this." The police canvassed the neighborhood "looking for anybody that would have something similar to a horizontal-striped yellow and dark colored shirt on, which is relatively unique." During the canvas, the police learned Matt Grady had been wearing that type of shirt during the early morning hours in which Scott was killed.

When Simon returned to the Scroggins house on the afternoon of the August 17, McTaggart was there, and Simon approached the detective.

---

[6] McTaggart checked 23rd Street south of the church's driveway and discovered there was no broken glass in the street south of the driveway.
[7] At trial, McTaggart testified the 22nd/University Kum & Go is nearby, only a couple of blocks away or less than one-half mile from the crime scene at the 23rd Street church.

McTaggart described Simon's demeanor: "He appeared to be a little concerned and wanted to talk." McTaggart described Simon's level of cooperation as "forthcoming in his information." McTaggart observed Simon's hair was "back in corn rows" and "not a full sticking out head of hair." Simon testified he talked to the police about Grady being present at the party (although Simon did not know his name), what Grady was wearing, and what Grady looked like.

Based on this information, McTaggart met with Simon again later that same day and showed Simon a photographic lineup. The following joint stipulation concerning the lineup was read to the jury: "Detective McTaggart prepared a photo lineup of six similar-looking African American males. [Grady's] picture was placed in position six. Demarkus Simon reviewed the photo lineup, identified the defendant in position six. The defense will stipulate that the defendant was in position six."

Ryan Harger, a records custodian for Sprint/Nextel testified Grady had a "boost mobile account" that was established in June 2008. His account "had regular voice, text messages, [and] web access." "Boost" is a prepaid service in which Grady had to pay up front and which had no set expiration date. State's Exhibit 32 detailed the incoming and outgoing calls on Grady's phone starting at midnight on August 17, 2009. Harger explained the exhibit. On August 17 numerous outgoing calls were made from Grady's phone from midnight to 3:24 a.m. The exhibit shows an incoming call from Grady's sister's phone at 3:25 a.m. for sixteen seconds and no other calls, outgoing or incoming, from 3:25 a.m. to 4:03 a.m. Harger testified the last outgoing call, for "zero" seconds was placed at

4:03 a.m., and no additional *outgoing* calls were made from Grady's phone. We note the video shows 4:03 is the point in time Scott returned to his car to leave the Kum & Go.[8]

David Titcomb, a compliance officer with the Iowa Department of Transportation's Office of Driver's Services (DOT), testified at trial. Titcomb testified the status of Grady's December 8, 2008 driver's license changed on April 21, 2009, and this new status remained in place through the end of August 2009—there were "no further changes in [Grady's] status." Titcomb explained State's Exhibit 69 and accompanying picture to the jury. Exhibit 69 "is a copy of the application on record with the [DOT] showing a non-operation identification card was issued to [Grady] on August 18, 2009, at 11:45 a.m." The application shows (1) Grady went to the Highland Park DOT office (on the day after the homicide) to get the identification card, (2) Grady provided his aunt's address to the DOT, and (3) Grady provided a height of 5' 8" and a weight of 150 pounds. The DOT took Grady's picture, and his hair in the picture is close to his head in tightly braided corn rows/French braids and is not similar to the "curly, curly" hairstyle Archila Lopez recognized at trial. We note Archila Lopez testified the man he saw was "maybe short or so-so," not tall.

Sprint employee Harder testified on August 20, 2009, (three days after the homicide) the "account holder [Grady] called in to our customer service and

---

[8] After 4:03 a.m., Grady's phone received three incoming calls on August 17—at 6:00 a.m. (zero seconds), 6:00 a.m. (eight seconds), and 6:01 a.m. (four seconds)—all from his mother's phone number. In the early afternoon of August 17, Grady's phone received two incoming calls from his sister's phone number at 12:56 p.m. (five seconds) and 12:57 p.m. (zero seconds).

declared the phone was either lost or stolen and asked that . . . service be suspended on the account."[9]  Harder testified in such circumstances, "there is no money returned to the customer" who had prepaid for the phone.

Four days after the homicide and the day after Grady cancelled his cell phone, the police executed a search warrant at the south-side apartment of Grady's sister on the afternoon of August 21.  No one was home, and they left a notice of their presence.  The police found numerous papers with Grady's name, a yellow-striped "bumblebee" shirt, a white tee shirt, and a spare magazine for a Makarov pistol.  McTaggart explained to the jury the significance of finding one Makarov magazine (clip): "Usually when you purchase a gun . . . they are sold in a box or package and there will be a handgun and two magazines, one for the gun itself when it is in use and one for reserve or spare."  The magazine did not contain bullets, and the police were not able to locate a gun for it.

Five days after the homicide and on the evening of the afternoon search, shortly after midnight on August 22, uniformed officer Chad Steffen saw Grady walking down Forest Avenue.  Steffen turned his marked patrol car around to head the same direction as Grady, rolled by Grady, and asked through the open window, "Is your name Matt?"  Grady appeared startled and said, "No."  Steffen pulled ahead to "cut him off as he was walking," and again asked, "Are you Matthew Grady?"  Grady again said, "No."  As Steffen opened his door to exit the patrol car, Grady ran away.  Steffen gave chase on foot, noting Grady had something in his hand.  Grady eluded Steffen, who then returned to his car and

---

[9] State's Exhibit 32 shows the Sprint customer passed authentication by providing a pin and by answering a security question.

continued to drive around and search the area. Steffen eventually caught Grady, who claimed he ran because he had marijuana. When Grady was caught, he had a phone charger with him but not a phone. Steffen testified the item he observed in Grady's hand as he chased him did not appear to be marijuana.

After Grady was taken into custody, Detectives McTaggart and Blom interviewed him on August 22 around 1:00 a.m. McTaggart testified State's Exhibit 68 accurately depicted Grady's appearance at the interview—hair sticking out in numerous tight curls or short dreadlocks. McTaggart described Grady as being 5'8" tall and weighing 160 pounds at the time of the interview.

Subsequently, Grady was charged with the first-degree murder of Scott. In March 2013 Grady's second jury trial commenced. In addition to the testimony detailed above, the State called April Sharpnack, the general manager of the Kum & Go store. Sharpnack testified business at 4:00 a.m. on Monday mornings like August 17 is slow and traffic on University at that time would be "slow, very slow." Sharpnack had reviewed the store's videos with the police, including the video showing the outside area.

> Q. When you were reviewing this with law enforcement, did you point something out to them? A. I pointed . . . out that there was someone else in [Scott's] car.
> Q. What made you notice the other person in the car? A. I called it a "bumblebee" shirt, the striped shirt and the movement in the car.

Sharpnack identified State's Exhibit 19, the receipt found in Scott's pocket, as a time-stamped receipt from the 22nd/University store she managed. Sharpnack explained the receipt showed Grady purchased a Red Bull and received twenty dollars cash back. Sharpnack identified Anthony Wood as the

person running the cash register. She testified Scott left the inside camera at 4:03:12 and did not appear in that camera again.

Anthony Wood testified after the Red Bull transaction, he rang up one penny so the register would allow him to give Scott twenty dollars cash back.[10] Wood could not give Scott forty dollars cash back on his Red Bull purchase because the Kum & Go policy limits cash back to twenty dollars per transaction.

Sharpnack explained the video system also creates still photographs, and she identified the time-stamped still photos entered into evidence as State's Exhibit 22 (Scott exiting his car, passenger with "bumblebee" shirt plainly visible—3:59:38 a.m.), State's Exhibit 23 (Scott standing with his back to the camera preparing to reenter the car, passenger with "bumblebee" shirt plainly visible—4:03:16 a.m.), and State's Exhibit 24 (Scott's car backed away from the curb in front of the store, one yellow stripe visible on passenger—4:03:41 a.m.).

Crime scene investigator Megan Wilcutt was called to the car/tree scene, and she took videos and photographs and processed the scene. Wilcutt had to act quickly because of the approaching rain. As the video played she described the scene to the jury. Wilcutt noted the broken glass in the street trailed south from the car/tree scene. After observing a bullet wound in the victim, Wilcutt and her team looked for possible bullet holes:

> We had observed what appeared to be a bullet hole in the driver's side door, in the frame by the window, and possibly one on the interior of the passenger door, and then the back left window behind the driver was also shattered. We could not tell at that time

---

[10] Sharpnack explained the store's customers frequently did the penny purchase to avoid the two-dollar ATM charge for cash.

what had caused the shattering because there was no glass left intact in the window.

Wilcutt testified the two shirts Scott was wearing had bullet holes that corresponded with the bullet-hole injury in his back.

Gregory Gourd was retired at the time of trial after a thirty-year career as a crime scene technician for the Des Moines Police Department. Gourd videotaped and took still photos of the church scene.[11] While the video was played for the jury, Gourd identified the evidence shown by each placard. On the north side of the parking lot, Gourd identified placards 1 and 2 as shell casings and nearby placard 3 as a "plastic tip like a Tiparillo cigar."[12] Gourd identified placards 4 and 5 as auto glass and testified that was the only area in the parking lot where auto glass was found. Gourd pointed out placards 6 and 7, spent shell casings, on the curve of the narrow driveway running east and west along the north side of the church and then curving south to access the parking lot behind the building. Gourd stated it was a "good distance" between the two areas with shell casings. We note Exhibit 47, a still photo showing the driveway shell casings, clearly shows the back of the Archila Lopez house.

---

[11] Officer Eric Hartman used "Total Station" to document the church crime scene with measurements. Using computer software, Hartman created a diagram to scale showing a "birds-eye view of what was on scene that night including all the cars and everything." The jury was shown the crime-scene diagram Hartman created.

[12] Scott Stocksleger, a specialist in forensic DNA testing for the Iowa Department of Criminal Investigation (DCI), testified he examined the cigar tip and "was unable to develop a DNA profile from the item." Stocksleger explained the thirty-minute rain shower before the cigar tip was taken into evidence "absolutely" could have interfered with the DNA because the rain "may dilute" or "wash away" the saliva that had been on it.

Gourd pointed out the impact hole on the car parked near the end of the driveway by the street, placard 8.  Gourd recovered the bullet from the car door, State's Exhibit 5.  Gourd also discussed the unusual features of State's Exhibit 6,[13] a "spent, brass-colored Hornady brand, Makarov 9 by 18 shell casing."

> Q.  Is there anything unusual about the size of it?  A.  In all my time working at the PD I have never seen a 9 by 18 . . . .  Nine millimeters is 9 by 19, so this is just a little smaller.  But the word "Makarov" I had never seen that before, I had no idea what it was.

Gourd testified the other three shell casings were the same unique Makarov type and size. Detective McTaggart testified he researched guns in three police databases and learned a Makarov pistol is a rare gun.  Specifically, for the five years from August 1, 2009, until March 4, 2014, McTaggart discovered 320 guns were found by the Des Moines police and 7897 guns were pawned; those 8217 guns included a total of three Makarov guns.

Carl Wycoff, a senior crime scene investigator with the Des Moines police department, helped process Scott's car in the identification garage on the evening of August 17.  Wycoff saw an unopened can of Red Bull in the right front passenger seat.  When he opened the front passenger door, Wycoff saw a copper-jacket and a lead bullet fragment (State's Exhibit 3) on the floor near an empty Red Bull can.  Wycoff found glass behind the driver's seat consistent with broken safety glass.  Wycoff observed: "The condition of the driver's seat was interesting because it was laid back quite a bit . . . .  It was back to where the

---

[13] Gourd explained the State's Exhibit Numbers are not the same as the placard area/item numbers.  For the four shell casings, State Exhibits 6 and 7 correspond to parking lot shell casings placards 1 and 2.  State's Exhibits 8 and 9 correspond to driveway shell casings placards 6 and 7.

headrest was even back beyond the post dividing the front and back seat."
Wycoff testified in 90% of tests of bullet casings, analysts are not able to get
fingerprints off the casings.

Wycoff opined three shots impacted Scott's car, and he identified them for
the jury as gunshots #1, #2, and #3 on State's Exhibit 27A. Wycoff clarified the
numbers he had assigned did not represent the sequence in which the shots
were fired. Wycoff testified gunshot #1 entered the driver's open window from
the front of the car and into the car. "It passed across in front of Mr. Scott and
went into the armrest. It exited the armrest and then it hit the metal frame of the
[passenger] door. This is the bullet that separated from the copper jacket and
was recovered beneath the right front passenger seat."[14] Wycoff opined gunshot
#2 hit the door pillar/casing and did not enter the car. The police did not recover
this bullet. As to gunshot #3, Wycoff testified the bullet went through the rear
window and into Scott's body. Wycoff opined the shooter would have been from
two to four feet from the car when these shots were fired. Wycoff testified
gunshot #4 hit the other car that was parked alongside the driveway and near
23rd Street.

Victor Murillo, a criminalist with the Iowa Division of Criminal Investigation
(Iowa DCI) State Crime Laboratory in Ankeny, Iowa, with twenty-seven years of
experience, testified he performed tests on the evidence recovered during the
investigation. Murillo examined the "bumblebee" shirt and white tee shirt

---

[14] Wycoff explained the concept of trajectory analysis to the jury. Gunshot #1 was the
only gunshot where the investigators could do a trajectory analysis. State's Exhibit 27B
shows a red trajectory path for #1 and states: "19 degrees trajectory left to right, 20
degrees downward trajectory."

recovered from Grady's sister's apartment, and found neither item had the bullet holes he was checking for to test for gunshot residue:

> No bullet holes, no residues that I could associate with a bullet hole.  I don't really look for the residues.  I'm looking for a hole and then I try to associate the residues with the hole.  So I am not looking for trace amounts of powder or residues, like other laboratories could.  The examination that we use in our laboratory, we have to have a very high concentrations of those residues, and we are going to find those [high concentrations] close to that entry hole.

Murillo testified the more common pistol is the 9-millimeter Luger that uses a bullet with a 355-thousandths-of-an-inch diameter.  Murillo explained a 9-millimeter Makarov pistol is rarer than a Luger pistol.  Specifically, in the last nineteen years and out of 10,000 gun incidents investigated by the Iowa DCI, five incidents involved 9-millimeter Makarov pistols.  Murillo also explained the Makarov uses a bullet "a little bit wider than the 9-millimeter Luger bullet" at 365-thousandths-of-an-inch diameter.  Also, the overall cartridge on a 9-millimeter Luger "is longer than the Makarov, so you can't get the 9-millimeter Luger cartridge into the chamber of a Makarov pistol.  So they're not interchangeable.  You can't shoot one in the other or vice versa."

Murillo examined the magazine clip recovered from Grady's sister's apartment, which Grady admitted to owning.  Murillo stated it was "designed to hold [10] live rounds of ammunition" and its mechanics were functioning correctly so "it should work."  He identified the magazine as compatible with a 9–millimeter Makarov pistol and opined: "This magazine is quite rare."  He explained Grady's magazine was so unique that he could not find a match with any of the 4000 or so different makes and models of firearms in the crime lab's reference collection,

including the collection's Makarov pistols. Because Grady's magazine is "thicker than most of the magazines for Makarov pistols," it would not fit in any of the four Makarovs in the reference collection.

Murillo also examined three bullets recovered from the crime scene, measuring their diameter. He opined all three bullets "are a little wider than the 9-millimeter Luger" bullets and originated from 9-millimeter Makarov cartridges. Murillo examined the "rifling characteristics" or grooves on the outside surfaces and concluded all three bullets "had the same type of rifling information on them." Murillo opined: "These bullets came from cartridges that could have been loaded into [Grady's] magazine."

Murillo also described his process for doing a microscopic analysis of the bullets, noting every gun is going to leave a fingerprint on every bullet, on every cartridge case it fires." After showing the jury pictures of the similarities on the bullets, Murillo opined "all three were positively identified as having been fired from the same firearm. So, one gun was used to produce all three of these bullets." Further, all three bullets came from a 9-millimeter cartridge and all were fired from a 9-millimeter Makarov pistol.[15] Murillo loaded the images of the bullets and the images of the cartridges into a database of 10,000 images,

---

[15] Murillo testified if someone had tried to fire the recovered casings and bullets from a gun other than a 9-millimeter Makarov, he "would see some unusual characteristics on those fired bullets and casings. The bullet [and cartridge cases] wouldn't make contact with the barrel correctly and we would see that." Here, the bullets and casings did not contain the "different, unique characteristics that would indicate" firing from "a gun not designed for that particular cartridge." Rather, all the bullets and all the cartridge cases were "fired in a gun in a chamber that was designed for the 9-millimeter Makarov cartridge."

NIBIN, and no matches occurred. "So, from the information we have, this gun was not used in another shooting" in Iowa or Nebraska.

Murillo also examined the four cartridge cases and concluded they were all 9–millimeter Makarov cartridge cases. He performed the same type of analysis as he had on the bullets, looking for the "unique markings," and concluded all the cartridges "were fired from the same firearm. So, one firearm was used to boost all four of the fired casings."[16]

Finally, the parties stipulated to the testimony of the medical examiner, who opined Scott, after being shot, "could have retained consciousness for a matter of minutes and to a degree that would have allowed him to commandeer a motor vehicle for a short distance with some semblance of order." The medical examiner recovered a 9-millimeter bullet from Scott's body and found the cause of death to be the gunshot and the manner of death to be homicide. He also opined the "direction of fire was back to front, left to right, and downward."

The defense called Rayshon Johnson, who met Grady for the first time in in October 2013 in the Polk County jail, although Johnson and Grady had friends in common. Johnson had been in jail since June 19, 2013, on a federal narcotics charge and was facing a possible punishment of ten years to life. Johnson eventually learned Grady was in jail for murder.

Johnson had mutual friends/family with Demarkus Simon and had sold drugs to Simon. Johnson testified from June to October 2009 he would supply

---

[16] Murillo could not tie Grady's magazine to the fired bullets or the fired cartridge cases because "we have to have the gun so that we cycle that ammunition in and out of the magazine correctly."

marijuana to Simon on credit. Simon would pay Johnson after Simon sold the marijuana to others. In July or August 2009, Johnson and Simon were outside a house by Good Park with four or five others, drinking and smoking weed— "partying." Johnson and Simon were cracking jokes on each other and Johnson's joke about Simon's teeth upset Simon, who stated:

> [Simon] made a serve near the Kum & Go to a faggot-ass white boy, and that the white boy was reaching for his dick or something. And that he had the money on him, but he didn't want to pay him for the crack that he was selling him. And [Simon] got out the car and he knocked him off.

Johnson was on parole in 2009 and did not tell his parole officer about Simon's confession. Johnson claimed he did not want to testify at Grady's 2014 trial because Grady "is nothing to me" and Simon "is basically a part of my family." Johnson identified Defense Exhibit A, a somewhat blurry picture, as a picture showing Simon as he looked 2009. Johnson stated Simon's hairstyle, braided close to his head, is called a French braid. We note during Simon's trial testimony the previous day, Simon testified he did not know Rayshon Johnson. On cross-examination, Johnson testified:

> Q. And that picture that you saw earlier, that's Demarkus Simon? A. Yes.
> Q. Now, when you were first shown that picture was today; right? A. Yes.
> Q. And at first you didn't recognize him as Demarkus Simon, did you? A. I recognized it but, I mean, the picture is kind of blurry.
> Q. Your initial response after seeing that photo was, that's not Demarkus Simon, wasn't it? A. Yes.

Also on cross-examination, Johnson admitted he did not see Simon very often and in fact, since 2009 he had "hardly seen him at all." Further, Johnson

agreed he had known Simon for only about a month or a little more when Simon confessed to him. Johnson testified the other people there heard the "cracking jokes" part of the conversation but nobody else heard the confession part, except maybe Simon's brother, because "me and [Simon] went off to the side a little bit." Johnson testified:

> Q. It was in 2010 that you next actually thought about this conversation, right? A. Yes.
> Q. So like a year later? A. Yep. Yes, about a year.
> Q. That's because you learned that [Simon] was or had talked to the police about the defendant; right? A. Yes.
> Q. At that time it registered, wait a minute, that's when you remembered the conversation? A. Yes.
> Q. . . . Okay. I'll rephrase it. In 2010 when you learned Demarkus was talking to the police about the defendant, you then remembered the conversation . . . with Demarkus a year before? A. I mean, I don't know if he was talking to the cops.

In 2010 Johnson did not talk to the police, and he did not talk to the county attorney. When Johnson met Grady in jail in October 2013, he told Grady about Simon's confession.[17] Cross-examination continued:

> Q. But you are aware that it's possible for your attorney to ask for a benefit in your federal case? A. I wasn't aware of that no.
> Q. And here you are now testifying for the defendant; correct? A. Yes.
> Q. And you're sharing information with this jury; right? A. Yes.
> Q. Claiming that Demarkus [Simon] made this statement to you? A. Yes.
> Q. First time you've shared this information with anyone involved in this case? A. Yes.
> Q. And it's almost five years since [Simon] said it to you? A. Yes.

---

[17] We note Johnson even telling Grady, who he met for the first time in jail, seems incongruous if Grady "is nothing" to Johnson while Simon is "like family."

On redirect, Johnson stated he and Simon went off to get the drugs and Simon made the statement. On cross-examination, the prosecutor sought to clarify whether Johnson was *talking* about drugs with Simon or Johnson was *giving* the drugs to Simon when the statement was made. Johnson testified, "We, basically, spun off to talk about the drugs before I handed the drugs over to him." The prosecutor pointed out this differed from Johnson's deposition testimony given the same month as the trial, that "me and him was ducked off a little bit, basically, chopping it up as soon as we got done cracking jokes on each other."

Grady did not testify at trial. On rebuttal, the State called Johnson's parole officer. The jury returned a guilty verdict, and this appeal followed.

## II. Standard of Review

"[T]o the extent a challenge to a trial court ruling on the admissibility of evidence implicates the interpretation of a statute or a rule of evidence, our review is for errors at law." *State v. Cox*, 781 N.W.2d 757, 760 (Iowa 2010). We review a district court's ruling regarding the admission of prior bad acts evidence for an abuse of discretion. *State v. Richards*, 809 N.W.2d 80, 89 (Iowa 2012). A court abuses its discretion when its ruling is based "on grounds or reasons clearly untenable or to an extent clearly unreasonable." *Cox*, 781 N.W.2d at 760. We review de novo Grady's pro se challenge to the district court's suppression ruling based on constitutional grounds. *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001).

### III. Opinion on Credibility

At trial, the State did not offer into evidence the tape or transcript of McTaggart's fifty-three minute interview of Grady. Instead, McTaggart testified to Grady's statements during the interrogation. On appeal, Grady challenges the following testimony by McTaggart regarding Grady being "overall deceptive" during the interview:

> Q. In general, how would you describe [Grady's] demeanor during the fifty-three minute long interview? A. Nervous, reluctant, overall deceptive.
> Q. Was he sober? A. Yes, appeared to be.
> DEFENSE COUNSEL: Objection . . . . "Overall deceptive" was the answer and . . . that's pure speculation, no foundation for it.
> THE COURT: Overruled.
> Q. So your answer that you found him to be deceptive, that's based on the interview, is that correct? A. Yes.

Grady claims his credibility is not a "fact in issue" under our rules of evidence. *See State v. Myers*, 382 N.W.2d 91, 95 (Iowa 1986) ("[E]xpert opinions on the truthfulness of a witness should generally be excluded because weighing the truthfulness of a witness is a matter reserved exclusively to the fact finder."); *see also* Iowa Rs. Evid. 5.701 (lay opinion testimony), 5.702 (expert opinion testimony). The State responds McTaggart did not testify as an expert but as the main investigator who interviewed twelve of twenty witnesses. The State also claims Grady failed to preserve error for the challenge he now presents on appeal because he failed to object on the ground of improper opinion testimony. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Finally, the State claims any error was harmless because the "overwhelming evidence of Grady's guilt dwarfed the detective's cumulative statement."

**A. McTaggart's Testimony.** Assuming error was preserved, we turn to McTaggart's other, unchallenged testimony[18] at trial describing Grady's interrogation statements. Grady told McTaggart he had been staying with his sister (on the south side of Des Moines) and his aunt on 17th Street in Des Moines. McTaggart did not recall if Grady talked of staying with his mother, who lives in a different house near his aunt on 17th Street; both houses are south of University.

McTaggart asked Grady about his whereabouts on August 16 through August 17. Grady originally told McTaggart he was with a friend, Terrell Young,[19] and "they had been hanging out near 24th and Drake Park [Avenue] looking for some girls."[20] Later, Grady changed his story and told McTaggart he was not at that location looking for girls. Grady also gave McTaggart two different answers regarding his whereabouts around 4:00 a.m. the day Scott was murdered. McTaggart explained:

> Q. Just so I am clear, at one point the defendant says at 4:00 in the morning he was at a house at 17th Street and University, is that correct? A. Yes.
> . . . .
> Q. At another point in the conversation the defendant says at the exact time he was at Vera Scroggins's house . . . ? A. Yes.
> Q. Did he indicate anyone else who was at Vera's house at approximately 4:00 in the morning, if he was at that location. A. [Grady] stated there was two older guys there but he didn't know their names.

---

[18] In our analysis, we do not rely in any way on the evidence challenged in the upcoming issues—Grady's prior shooting of a gun and the parole officer's rebuttal testimony.

[19] McTaggart testified he had met Young and had seen photos of Young. Young wears his hair short all the way around, the same length but not a buzz cut.

[20] A park in Des Moines named Drake Park is bounded on the north by Drake Park Avenue and by 23rd Street on the east and 24th Street on the west.

During the interview, McTaggart showed Grady a picture of Scott and asked Grady if he knew Scott. Grady replied he had seen Scott and his car "before." Grady accurately described Scott's vehicle as a white or silver four-door car. Grady denied shooting Scott. McTaggart testified:

> Q. Did he indicate whether he had ever talked to Stephen [Scott] before? A. [Grady] stated that he had never talked to him, never been in his car but he had been around him.
> Q. When you say "been around him," describe that. A. [Grady] stated that he had seen him about a month before driving around that neighborhood . . . trying to talk to other guys about some homosexual activity.

Because he wanted to see Grady's reaction, McTaggart then told Grady about the search warrant executed at his sister's apartment "and also there was a video of him in a vehicle outside of Kum & Go at 4:00 in the morning." Faced with evidence he could not deny, Grady changed his story, specifically stating, "I lied," regarding not ever being in Scott's car with Scott. Grady admitted to being in Scott's car on August 17 and admitted he was the passenger shown in the August 17 video. Grady also admitted the "bumblebee" shirt the police found in his sister's apartment belonged to him, and he admitted he wore it on August 17. Grady also admitted the Makarov gun magazine discovered during the search of his sister's apartment belonged to him, "he knew it was there," and "he did not have bullets for it."

Grady's new story was that Scott had picked him up near 21st/University. Grady asked Scott to give him a ride to the east side and to buy him a cigar tip, but Scott did not buy him a cigar tip. Grady claimed "nothing had happened in the car with Stephen Scott." We note the police did recover a cigar tip along with

the other evidence in the church parking lot. McTaggart testified he was not aware of Grady or any of his family living on the east side. The video played for the jury shows Scott's car headed west upon exiting the Kum & Go. Later in the interview, Grady changed his original story "nothing happened" after leaving the Kum & Go. McTaggart testified:

> Q. What did [Grady] say happened after they left the Kum & Go? A. He stated [Scott] would not give him a ride to the east side and [Scott] "got on some bullshit," and Mr. Grady stated that he got out of the car right around Drake Park.
> . . . .
> Q. So [Grady] is saying nothing happened and then at another point he is saying some, quote bullshit happened? A. Yes.

**B. Harmless Error.** During appellate oral argument, Grady's counsel acknowledged Grady originally lied about two separate matters—whether he was or was not in Scott's car that morning and whether "nothing happened" or some "bullshit" happened while he was in the car with Scott. Counsel claimed, however, Grady's two instances of lying during the interview, including his direct statement, "I lied," do not make the McTaggart's statement Grady was "overall deceptive" during the interview cumulative evidence.

While we have some question as to the validity of appellate counsel's attempted distinction, even if the challenged phrase was erroneously admitted into evidence, the circumstances of this case show the admission was harmless error. *See* Iowa R. Evid. 5.103 (a) ("Error may not be predicated upon a ruling [admitting] evidence unless a substantial right of [Grady] is affected."); *see also State v. Williams*, 574 N.W.2d 293, 298 (Iowa 1998) ("Not all errors require reversal. To warrant reversal the error must have prejudiced the defendant.").

Because any error was not of constitutional dimensions, we reverse only when it appears Grady's rights "have been injuriously affected by the error or that he has suffered a miscarriage of justice." *See State v. Henderson*, 696 N.W.2d 5, 12 (Iowa 2005). In applying this test, "we presume prejudice—that is, a substantial right of the defendant is affected—and *reverse* unless the record affirmatively establishes otherwise." *State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004).

Here, the State presented overwhelming proof of Grady's guilt. The police recovered the unique shirt in Grady's sister's apartment, and Grady admitted ownership. Grady also admitted he wore the unique "bumblebee" shirt on the morning of the shooting. It is undisputed Grady recognized Scott's picture and had seen Scott driving in the neighborhood thirty days before the shooting. It is undisputed Grady knew Scott drove a white or silver four-door vehicle and knew Scott sought out homosexual activities in the neighborhood. It is undisputed Grady first told McTaggart he had never talked to Scott or got into his vehicle, and then Grady admitted that was a lie because Grady was with Scott and got in Scott's vehicle on the morning of the shooting. Grady admitted he was the passenger wearing the "bumblebee shirt" in Scott's vehicle at the Kum & Go. Officials recovered a time-stamped receipt from the Kum & Go in Scott's pocket.

The undisputed video evidence shows Scott and Grady were together at the convenience store from 4:00 a.m. to 4:04 a.m. Officials received the 911 call thirteen minutes later. Grady first told McTaggart nothing happened while he was with Scott but later admitted some "bullshit" happened. The evidence shows, at some point during those thirteen minutes: (1) Scott drove to the

parking lot of a church located two blocks south of the Kum & Go store; (2) a twenty-dollar bill disappeared from Scott's pocket; (3) Scott's driver's seat was placed in a reclining position unusual for driving; (4) Scott's pants were unzipped and his underwear was pushed down; (5) a rare Makarov pistol was shot four times, leaving two cartridges in the church parking lot and two at the curve in the narrow driveway, and leaving three bullets; (6) a Makarov bullet shot from a position in front of Scott's car went through the open driver's window, hit the front armrest, and ended up on the floor by the front passenger seat; (7) an unrecovered bullet hit the metal casing between Scott's front and rear windows; (8) a Makarov bullet shattered the glass in the rear window and entered Scott's body; (9) a Makarov bullet hit a car parked in the yard of a house near the driveway entrance/23rd Street; (10) a black male stood by Scott's car; (11) Scott turned right at the end of the driveway and drives north on 23rd Street, leaving behind a trail of glass; (12) the black male ran north through the yard; (13) Scott hit a tree; (14) Riggs heard the crash and ran outside, telling his brother to call 911; and (15) the 911 call center logged the call at 4:17 a.m.

Although Scott did not buy Grady a cigar tip, Grady admitted he asked Scott to buy him one, showing Grady smoked them. A cigar tip was recovered in the church parking lot near the two shell casings. After the gunshots, Archila Lopez saw a black male with Grady's hairstyle (short, curly dreadlocks sticking out all over) and with something over his shoulder standing by Scott's car. Archila Lopez saw the black male run to the north, which allowed the man to keep the car in sight and see what might happen. When Grady returned to the

Scroggins house approximately twenty minutes after the loud noises/gunshots, he had, in fact, seen what happened and told Simon a car had hit a tree. Grady was nervous, did not want to go the accident scene, and took off the unique "bumblebee" shirt and (again) put it over his shoulder.

The day after the murder, Grady acted to obtain a new official government photograph showing him with a different hairstyle—French braids close to his head—even though his driving status had not changed. If the police searched for him, this new application would lead the police to his aunt's house and not to his sister's house where the "bumblebee" shirt and Makarov magazine were located. Three days after the homicide, Grady called and cancelled the prepaid cell phone he had used for fourteen months, since June 2008, even though he would not receive a refund. Grady ran from Officer Steffen on the evening the search warrant had been executed when Steffen asked if he was "Matt Grady." At that time, Grady had already changed his hair back to the short, curly dreadlocks style that did not match his new government photograph.

It is undisputed Grady owned a "unique" magazine clip for a "rare" 9-millimeter Makarov pistol. Generally, guns are sold with two clips. Murillo concluded the recovered bullets were in cartridges that could be loaded into Grady's magazine clip, Grady's clip was in working order, all three bullets were fired from the same 9-millimeter Makarov pistol, not from a non-Makarov pistol, and all four cartridges were fired from the same 9-millimeter Makarov pistol, not from a non-Makarov pistol. This leads to the reasonable conclusion there was one shooter with one Makarov pistol, a conclusion reinforced by the fact Archila

Lopez saw only one person standing near Scott's car—a black male with "curly, curly" hair similar to Grady's hair. Again, Grady is the black male owner of the "unique" magazine clip.

In short, we are confident the State's case on the murder charge was so overwhelming the State would have prevailed in the absence of McTaggart's testimony Grady was "overall deceptive" during his interrogation. Nor did Johnson's testimony of Simon's alleged confession undermine the State's powerful evidence as Johnson's attempt to cast Simon as the perpetrator, someone like "family" but whose picture Johnson did not recognize at first, someone who confessed to a murder after only knowing Johnson a little over a month, was inherently unbelievable.

## IV. Prior Firing of Gun

Grady's next challenge also involves testimony from McTaggart admitted into evidence over defense counsel's prior-bad-acts objection:

> Q. In [Grady's August 22, 2009 interview,] after he was advised regarding the search warrant and the tape recording from the Kum & Go convenience store did [Grady] make any statements regarding previously firing a gun? A. Yes.
> Q. Did he admit that he had previously fired a gun approximately one month before this incident? A. Yes. He said to me, yes, he had fired a gun approximately one month before this incident.[21]

Grady contends this evidence was improper under Iowa Rule of Evidence 5.404(b), where "the important question is whether the disputed evidence is

---

[21] Defense counsel objected to the testimony asserting it was not relevant. "It's basically just he fired a gun before so we can assume that he fired a gun again this time." The court found "one of the central issues in the case is whether he fired a gun on this occasion." The court allowed the evidence, finding it to be relevant and finding the probative value was not outweighed by any prejudicial impact.

relevant and material to some legitimate issue other than a general propensity to commit wrongful acts." *State v. Nelson*, 791 N.W.2d 414, 425 (Iowa 2010).

      **A. Relevance.** Assuming, but not deciding, the challenged evidence even constitutes a "bad act," the first hurdle for admission is relevancy. *See State v. Duncan*, 710 N.W.2d 34, 40 (Iowa 2006). "Evidence is relevant when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. Reynolds*, 765 N.W.2d 283, 290 (Iowa 2009).

      Grady claims the evidence is not relevant because it does not make the disputed issue, whether Grady was the shooter, more or less likely. Grady claims because nothing is known about the firearm previously shot by him—the previous firearm is not "strikingly similar" or "of a unique nature"—the State failed to lay the foundation to establish relevance.

      The State claims Grady presented an identity defense and "the main issue was proving Grady was the person who shot Scott," so the fact that Grady "knew how to fire a weapon—standing alone—was substantially probative to establishing his identity as Scott's killer." Scott's "murderer had to be someone who knew how to operate a gun and who had access to a gun." The State claims the challenged evidence was relevant for three non-propensity purposes: identity, knowledge (of how to use the murder weapon), and opportunity (to access such a weapon).

Upon our review, we agree with the district court, McTaggart's testimony Grady admitted to shooting a gun thirty days prior to the homicide is relevant to the material and legitimate issues of identity, knowledge, and access.

**B. Balancing Test.** Our next step is to evaluate whether the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice to the defendant." *Nelson*, 791 N.W.2d at 425; *see also State v. Newell*, 710 N.W.2d 6, 20-21 (Iowa 2006).

Grady claims the prejudice to him substantially outweighed any probative value because the jury was free to "speculate widely about the incident." The State responds Grady's "vague admission to having previously fired a gun" did not result in unfair prejudice because the admission "did not provide the jury with any prejudicial details" and "the jury heard nothing to suggest Grady fired the gun in an assaultive manner or during the commission of a crime." The State also claims the prosecutor, during closing argument, "guided the jury to consider Grady's prior gun experience for non-propensity purposes of proving his knowledge, opportunity, and identity."

We need not resolve this unfair-prejudice issue, however, because even if the challenged evidence was unfairly prejudicial and erroneously admitted, we find the court's admission was harmless error. We see no reason to restate our previous harmless-error analysis, but it is equally applicable to our resolution of this issue. The State's case was so overwhelming the State would have prevailed in the absence of McTaggart's testimony Grady admitted to shooting a gun one month prior to the homicide.

## V. Opinion on Character for Truthfulness

Grady claims the trial court erred in allowing into evidence the impeachment testimony of Donault Moore, a rebuttal witness for the State. Grady claims Moore attacked the truthfulness of defense witness Rayshon Johnson beyond the scope of allowable "character" evidence in Iowa Rule of Evidence 5.608 by giving anecdotal evidence and by calling Johnson a liar.

During rebuttal, Moore testified he was a probation and parole officer for the State. In that capacity he supervised Johnson's parole from May 2009 to June 2010. The prosecutor then asked if, during that time, Moore had formed an opinion regarding Rayshon Johnson's character for truthfulness or untruthfulness. The court sustained defense counsel's objection on foundation, and the prosecutor asked additional questions to establish a foundation.

> Q.  You have already testified that Mr. Johnson was on parole to you; correct?  A.  Correct.
> Q.  And how often did you meet with him?  A.  Probably twice a month.
> Q.  What kind of things was he supposed to report to you? A.  Various things from where he was working, where he was living, his week-to-week activities, along with whether or not he was job searching, whether—means of education he was obtaining, things of that nature.
> Q.  Basically you . . . required him to keep you informed of just about everything that was going on in his life?  A.  Correct.
> Q.  And during that time did you form an opinion regarding Mr. Johnson's character for truthfulness or untruthfulness?
> DEFENSE COUNSEL:  Objection.  Lack of foundation.
> THE COURT:  Overruled.
> [UNREPORTED SIDEBAR]
> A.  Yes, I did at times.
> Q.  And based on your experience with him, what . . . is that opinion?  A.  My opinion is that he was pretty much a lot of the times he would tell me whatever he wanted me to know type of— just to keep me from basically being in his business.  At times he would lie if necessary.

Q. Well, so I want to be very clear. What is your opinion as to his character for truthfulness or untruthfulness? Is it truthful or untruthful? A. Untruthful.

The next day defense counsel asked the court to reconsider its ruling, stating after doing research, "I believe that Mr. Moore's testimony yesterday was improper opinion testimony." The court interrupted, stating, "You can say what you want, but no one said anything, nor did I ever evaluate it as though the witness were an expert witness giving an expert opinion on credibility, but go ahead." After listening to the arguments of counsel, the court ruled "there were two objections made, both of which were lack of foundation . . . ." If a party objects, "lack of foundation" and "doesn't say anything else," that party "has not made a sufficient objection for the court to rule on." The court stated the unreported discussion during the sidebar was, "Well, what further foundation do you want?" The court recalled "the State offered to lay a foundation of the instances that the witness was relying on in forming his opinion." However, "the judgment of defense counsel was that they did not want to go into specific acts, so I am not sure what further foundation you wanted." The court denied the motion for reconsideration, ruling: "My judgment was the State had laid an adequate foundation to offer this witness's opinion, and it was clearly admissible under [Iowa Rule of Evidence] 5.608(a)."

Assuming error was preserved, we see no reason to restate our previous harmless-error analysis, but it is equally applicable to our resolution of this issue. We again mention our detailed, harmless-error analysis does not rely on or include *any* of the evidence challenged in this appeal. We conclude the State's

case was so overwhelming the State would have prevailed in the absence of the Moore's challenged testimony.

## VI. Pro Se Claims—Search Warrant

Grady claims the warrant affidavit contained false statements from Tiffany Stockbauer (timing), Demarkus Simon (whether Grady indicated someone was dead), and Derrick Robinson (timing). Upon our de novo review of the record, we conclude Grady has failed to prove a deliberate falsehood or reckless disregard of any material facts. *See State v. Neihaus*, 452 N.W.2d 184, 186 (Iowa 1990) (stating the inquiry is "limited to a determination of whether the affiant was purposely untruthful with regard to a material fact in his or her application for the warrant, or acted with reckless disregard for the truth").

Grady also claims McTaggart omitted certain information from the warrant application, including the facts (1) various witnesses were using drugs or alcohol, (2) Simon heard fireworks, (3) Simon was only 90% positive the striped shirt observed in the convenience store video was the shirt Grady was wearing, and (4) Stockbauer's information from Dayton was from an unidentified person. Our de novo review shows any such omissions in the warrant application were not material. *See State v. Prior*, 617 N.W.2d 260, 268 (Iowa 2000) (stating "probable cause does not require absolute certainty, but a probable determination through the eye of a reasonably prudent person"); *State v. Ripperger*, 514 N.W.2d 740, 745 (Iowa Ct. App. 1994) ("The omission of facts rises to the level of misrepresentation only if the omitted facts cast doubt on the existence of probable cause.").

Next, Grady claims the "facts that were presented before the issuing judge did not support a finding that the citizen informants were reliable and credible." Grady claims there was insufficient corroboration between the witnesses and "no citizen informant had first-hand knowledge of the murder." However, we recognize information given "by a citizen informant is generally reliable." *Neihaus*, 452 N.W.2d at 189. In general, "the reliability of a citizen informant" is shown "by the very nature of the circumstances under which the incriminating information became known." *Id.* Here the warrant application relied on named citizen informants and each informant, present either before or after the murder, independently identified Grady as a suspect. Each informant's consistent statements helped to verify the reliability of the other informants. The named informants, collectively, provided sufficient information for the police to connect Grady to the murder. We conclude the informants' statements were sufficiently reliable to support probable cause.[22]

Finally, Grady claims the warrant had an impermissibly broad scope because there was an insufficient nexus between the criminal activity, the things to be seized, and the place to be searched. But Grady had been identified as the person with the victim shortly before the shooting. As the prime suspect, probable cause supported an inference the police would find gun evidence at the apartment in which Grady had been staying. The warrant also set forth a

---

[22] We find no merit to Grady's claim the warrant was invalid due to Tiffany Stockbauer's information allegedly being based on double hearsay. *See Niehaus*, 452 N.W.2d at 190 ("[D]ouble hearsay does not necessarily invalidate a warrant" but "caution should be exercised in issuing a warrant based almost solely upon such information"). It is undisputed Stockbauer did not provide "almost solely" the information supporting the warrant.

sufficient nexus to search for the "bumblebee" shirt. Grady was seen wearing the shirt at the house party and the surveillance cameras showed a person wearing a "bumblebee" shirt in the car with Scott just minutes before the murder.[23]

## VII. Conclusion

Assuming error was preserved, even if McTaggart's testimony Grady was "overall deceptive" during the interview was erroneously admitted into evidence, the circumstances of this case show the admission was harmless error because the State presented overwhelming proof of Grady's guilt. Assuming, but not deciding, the previous firing of a gun even constitutes a "bad act," we conclude the challenged evidence is relevant. We need not resolve the unfair-prejudice issue, however, because even if the relevant evidence was unfairly prejudicial and erroneously admitted, we find the court's admission was harmless error. As to the testimony of the parole officer, assuming error was preserved, the State's case was so overwhelming the State would have prevailed in the absence of the challenged testimony. Finally, Grady's pro se claims are meritless.

**AFFIRMED.**

Tabor, P.J., concurs; McDonald, J., concurs specially.

---

[23] The fact the police found only a white tee shirt and not a white tank top when executing the search warrant did not prejudice Grady in the circumstances of Archila Lopez insisting the man he observed was wearing a white tank top with no sleeves, not a tee shirt.

**MCDONALD, J., (concurring specially)**

I concur in full with Divisions I, II, and VI of the majority opinion. I specially concur with respect to Divisions III-V, concluding that the alleged errors constitute harmless error. I concur in the judgment.